UNITED STATES of America,

v.

Forrest N. GERRY, Jr. a/k/a Harvey Bugbee, Defendant.

Crim. No. 87–00051 P.

United States District Court, D. Maine.

July 31, 1987.

Paula D. Silsby, Asst. U.S. Atty., Portland, Me., for plaintiff.

George F. Wood, Sanford, Me., for defendant.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge:

This case is before the Court on Defendant Forrest N. Gerry, Jr.'s motion to suppress evidence seized pursuant to a warrant search of his home. For the reasons stated herein, the motion will be denied.

After having conducted an evidentiary hearing, the Court finds the pertinent facts to be as follows. Since at least the beginning of 1987, Special Agent Wayne Steadman of the United States Drug Enforcement Administration (DEA) was involved in an investigation of methamphetamine manufacture in Maine and was searching for the laboratory in Maine where the manufacture was taking place. On April 14, 1987, the FBI advised Steadman that it had received an arrest warrant for Forrest N. Gerry, Jr., on a complaint for unlawful flight to avoid prosecution in violation of 18 U.S.C. § 1073. Gerry was wanted in New Jersey on a charge of conspiracy to manufacture methamphetamine. The FBI further advised Steadman that Gerry was residing in a house on Route 126 in Pittston, Maine and using the name Harvey Bugbee.

Steadman learned from Chief Gordon Glidden of the Gardiner, Maine police department that a man using the name Harvey Bugbee and living at the house in question was associating with one Richard Ayer, whom the DEA and state authorities had reasonable grounds to believe was involved in methamphetamine manufacture in Maine. Glidden identified a photograph of Gerry as the man known to him as Harvey Bugbee. Glidden told Steadman that Bugbee drove a brown Lincoln, was from Philadelphia, reportedly was on the run from authorities, and reportedly was involved with some younger persons and a drug known as "crack." Steadman thought the reference was more likely to "crank," a street name for methamphetamine.

Steadman shared this information with the other state and federal officers who would make up the arrest party. None of the officers had any specific information suggesting that Gerry or any of his associates were armed or had ever engaged in or threatened violence. The officers were aware, however, that methamphetamine manufacture involves chemicals that are highly volatile, inflammable, and/or toxic.

The arrest party proceeded to the house on Route 126. As the officers arrived, they noticed two cars in the driveway, neither of which was a brown Lincoln. They also noticed that the basement windows were painted black and that there were numerous lights on on the first floor. An individual named Dill came out of the house, was questioned briefly, and was allowed to leave in one of the vehicles. The remaining vehicle was known to the officers to be the one usually driven by Richard Ayer.

Two officers proceeded to the vestibule of the house, where they arrested Gerry. Other officers entered the house to perform a "protective sweep," *i.e.*, to search for other persons who might threaten the safety of the officers or destroy evidence on the premises and to check for the presence of immediately dangerous chemicals. In the course of this sweep, officers discovered what appeared to be a laboratory in the basement. Immediately thereafter, determining that no one else was in the house, the officers departed.

Subsequently, Agent Steadman applied for a federal warrant to search Gerry's house; Steadman's affidavit included information about the suspected laboratory observed in the basement. The magistrate issued the warrant and, in the course of executing it, officers seized laboratory equipment, chemicals, and approximately one kilogram of methamphetamine. Gerry now moves to suppress these items. He argues that the "protective sweep" was an illegal search, that the information about the laboratory in the basement must therefore be excised from the affidavit in support of the warrant application, and that without that information the magistrate lacked probable cause to issue the warrant.

The First Circuit has held that the imminent destruction, removal, or concealment of evidence is one type of exigent circum-

stance that would justify officers in making a warrantless entry into a dwelling. *United States v. Palumbo,* 742 F.2d 656, 658–59 (1st Cir.1984), *cert. denied,* 469 U.S. 1114, 105 S.Ct. 799, 83 L.Ed.2d 792 (1985). Where it is known that no one is on the premises, the premises may be secured merely by guarding the entrances, but in other circumstances officers may conduct " 'a very quick and limited pass through the premises to check for third persons who may destroy evidence.' " *Id.* at 659 (quoting *United States v. Agapito,* 620 F.2d 324, 335 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980)). In order for the circumstances to be sufficiently "exigent" so as to justify this warrantless intrusion, there must be "a *great* likelihood that evidence will be destroyed if there is a delay until a warrant can be obtained." *United States v. Veillette,* 778 F.2d 899, 902 (1st Cir.1985) (emphasis in original), *cert. denied,* — U.S. —, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). The Court should also consider "the gravity of the underlying offense [and] whether the delay poses a threat to police or the public safety...." *Id.* at 902.[1] Certainly no intrusion is justified where it is more likely than not that the premises are unoccupied or "the possibility of persons hiding in the basement [is] speculation." *Id.* at 902 n. 2.

■ In the instant case, the officers observed upon arriving at Gerry's house that Richard Ayer's car was in the driveway, that numerous lights were on on the first floor, and that the basement windows were painted black. The officers had reason to believe that Ayer was involved in methamphetamine manufacture in southern Maine, that there was a lab hidden somewhere in southern Maine, that Gerry had been involved in methamphetamine manufacture in New Jersey, and that he, Ayer, and others were involved in Maine with a drug known as "crack," which might have been "crank," *i.e.,* methamphetamine. These circumstances, taken together, gave the of-

ficers reason to believe that there was a great likelihood that Richard Ayer and/or others on the premises might destroy methamphetamine and/or evidence of its manufacture on the premises before the officers could obtain a search warrant.

■ Moreover, the officers knew that methamphetamine manufacture utilizes chemicals that are highly volatile, inflammable, and/or toxic. There was thus some danger that, if there was in fact a lab inside the house and especially if Gerry had been interrupted during the manufacturing process, there might be an explosion or other chemical incident that might destroy evidence and/or threaten the safety of officers posted outside the premises awaiting a search warrant. These possibilities, while not sufficient in themselves to justify the sweep, helped to do so when taken in combination with the likely destruction of evidence by third persons on the premises.

■ The Court concludes, however, that the sweep cannot be justified on the ground that the officers feared for their own safety. Neither Gerry nor any of his known associates was thought to be armed or to have threatened or engaged in violence in the past. Testimony at the suppression hearing did indicate that the level of violence associated with drug offenses in Maine is on the rise. But evidence of these kinds of general trends, in the absence of more particularized evidence about the individuals in question, is not a sufficiently exigent circumstance to overcome the individuals' Fourth Amendment rights. *See United States v. Hatcher,* 680 F.2d 438, 443–44 (6th Cir.1982) (holding that officers' protective sweep through basement, subsequent to arrest on drug charges, could not be justified on the sole ground that "the subject of drugs is a dangerous one, especially [for] those who are on the law enforcement side.")

Nevertheless, the sweep was justified for the other reasons outlined above. Informa-

---

**1.** The Court notes with some displeasure that neither counsel for Defendant nor the Assistant U.S. Attorney cited *Palumbo, Veillette, United States v. Cepulonis,* 530 F.2d 238, 244 (1st Cir.),

*cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976), or any other First Circuit precedent on the protective sweep issue.

278

tion gained from the sweep was therefore properly included in the affidavit supporting the warrant application. It follows that the magistrate had probable cause to issue the warrant.

The motion to suppress is therefore DENIED.